## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 12-30114
                                                          Chapter 7
Troy Alan Hentz,

                            Debtor.
_____/
Kip M. Kaler, as Bankruptcy Trustee for
Troy Alan Hentz,

                            Plaintiff,

            vs.                                           Adversary No. 12-07029

Troy Alan Hentz,

                            Defendant.
_____/

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

Debtor Troy Alan Hentz petitioned for relief under Chapter 7 of the Bankruptcy Code on February 17, 2012.  On July 27, 2012, Bankruptcy Trustee Kip M. Kaler filed an adversary complaint, alleging Debtor concealed assets and information, transferred assets to his wife's business and made false oaths.  The Trustee seeks an order and judgment denying Debtor a discharge under 11 U.S.C. § 727(a)(2), (3) and (4).

Debtor filed an answer to the adversary complaint on August 21, 2012, denying that he concealed his assets and financial information, transferred significant business assets into a corporation created by his wife and failed to keep records.  He also denies giving a false oath in his bankruptcy case.

1

The adversary proceeding was tried on January 31, 2013. For the reasons provided below, the Court finds in favor of the Trustee and orders that Debtor Troy Alan Hentz is denied a discharge in bankruptcy.

## II.  FINDINGS OF FACT

### A.  Debtor's Businesses and Employment

Debtor is an experienced businessman, who has owned and operated a variety of businesses. He opened his first business, a tree-moving company, in 1997. In 2002, Debtor formed a corporation named Valley Tree Service, Inc. Debtor was the sole shareholder and operator of Valley Tree Service. The primary business of this corporation was "digging trees" for other companies that would transport them to locations out of state.

The address of Valley Tree Service was 9812 County Road 21, Hankinson, North Dakota, which is simply a rural mail box. Debtor's home address is 9815 County Road 21, Hankinson, North Dakota. Debtor's father and mother live at 9810 County Road 21, Hankinson, North Dakota, which is 750 feet across the road from Debtor's home. There are seven buildings located on Debtor's parents' property, including a large shop and three quonsets. Debtor used some of these buildings for his businesses.

In 2005, Debtor formed VTS Rock, Inc. Like Valley Tree Service, the address of this corporation was 9812 County Road 21, Hankinson, North Dakota. Debtor was the sole shareholder and operator of this business as well. The primary purpose of VTS Rock was to extract, haul and sell landscaping boulders, gravel and sand. Debtor entered into leases which granted him the right to extract rock from gravel pits near Hankinson, North Dakota. Lease payments were based on the rock extracted.

2

Although Debtor continued to operate both Valley Tree Service and VTS Rock until 2008, his focus was on gravel and rock mining and hauling from 2006 to 2008. Debtor testified that he performed no tree-transfer work during the last two years of operating these businesses. According to Debtor, gross sales for his businesses totaled approximately $2,000,000 in 2007 and $3,500,000 in 2008. He projected sales of $4,000,000 for 2009.

In 2008, Debtor began negotiations with Mark Sand and Gravel Dakota Co. (Mark) for the buyout of Debtor's gravel mining and retail business. On August 4, 2008, Mark Thorson, on behalf of Mark, and Debtor, on behalf of VTS Rock, executed an Asset Sale and Purchase Agreement, providing that Mark would purchase eight pieces of equipment valued at $98,000 from VTS Rock and pay an additional sum to VTS Rock for transfer of leases and goodwill. Exh. 9. (Bates 305-336). Debtor also signed a non-compete agreement. Id. The total purchase price was $233,000 plus $3,000 upon transfer of a certain lease. The parties also agreed that Mark would employ Debtor as a "Senior Superintendent" and pay Debtor an attractive salary and benefit package as outlined on Exhibit 1 of the Asset Sale and Purchase Agreement. See Exh. 9 (Bates 327). In addition, Debtor was eligible for a bonus based on sales. Although the agreement does not specifically provide for a buyout of Valley Tree Service, Inc., Debtor maintained that he was "out of the tree business" by 2005 (Trial Testimony) and both of his businesses "ceased to exist by January 2, 2009." Exh. 11 (Resp. to Interrogatory 4).

In August 2008, Debtor began working for Mark, the business that was once his competitor. See Exh. 9. Debtor's responsibilities included managing Mark's business operations in North Dakota. From the end of 2008 to the beginning of 2011, Debtor was

3

employed by Mark.

On or about March 1, 2011, Debtor's employment with Mark ended.  He testified that he has not been employed outside the home since then.  Debtor explained that since he stopped working for Mark, he spends his time hanging out, watching television, fishing with his father and transporting his children to day care and caring for them when they are not in day care.  He also gets the mail for his wife's business, sorts it for her and answers the telephone for her business.  Occasionally, Debtor helps his wife make telephone calls to business associates, load recycled materials onto a semi-truck, run a tractor and drive a truck.

Mrs. Hentz testified that she does not know what he does with his free time during the day while their children are in day care.[1]

### B.    Debtor's Business Debt and the Sale of his Business Assets

After deciding to sell his business and eight pieces of equipment to Mark, Debtor made arrangements with Ritchie Bros. Auctioneers to sell the majority of remaining equipment owned by his businesses.[2]  Debtor testified that he spent a great deal of time and money preparing the equipment for sale and transporting it to Ritchie Bros. in Minneapolis, Minnesota, for the scheduled sale.  By the time of the auction sale, Debtor

---

[1] The Hentz's two children attend day care four days per week.  They attend day care when Mrs. Hentz is working.

[2] Some creditors, including "Case," Wallwork Truck Center and Packer Financial, would not grant permission for the sale of equipment which served as collateral for debt Debtor or his businesses owed to them.  Debtor did not sell this equipment at the Ritchie Bros. auction sale.  Other creditors who held liens against the equipment, including Lincoln State Bank, granted Debtor permission to sell collateral at the Ritchie Bros. auction.

4

claimed that he had spent his cash reserves on pre-sale expenses.

The Ritchie Bros. auction sale was held on September 30, 2008. Bids were not as high as Debtor expected. Debtor testified that he anticipated receiving proceeds (after sale costs and lien buyouts) in excess of $1,000,000, but the sale resulted in 25-30% of the expected sum. The sale proceeds were not sufficient to pay Debtor's business debts. Debtor testified that this event eventually led to his petition for bankruptcy relief, and he confirmed that all of the unsecured debts listed on Schedule F were incurred before September 30, 2008.

A few months prior to and during the time Debtor was employed by Mark (August 2008 to February 2011), creditors pursued efforts to collect debts owed by Debtor and his businesses. In 2008, multiple creditors filed lawsuits against Debtor and/or his businesses seeking to recover money.[3] One or more of the creditors pursued and received a garnishment against the salary Mark paid Debtor. Debtor testified that wage garnishments had been in place for at least a year before his employment with Mark ended. When asked whether Debtor knew he had creditors "breathing down his neck" in September 2008, Debtor answered "yes." Debtor's attorney also asked Debtor whether he was going to make it easy for creditors to collect, and Debtor answered

---

[3] Saliterman & Shefferman, PC and Lincoln State Bank filed lawsuits against Debtor in June and July 2008. Debtor had a dispute with General Equipment which began in the winter of 2007, and it sued Debtor and/or his companies on September 1, 2008. General Equipment has been vigorously trying to collect the $206,159.66 debt it claims Debtor owes. Northland Group Inc. sued Debtor before he received his bonus from Mark in March 2011. A former employee also filed a lawsuit in 2008 seeking to recover from Debtor.

5

"no."[4]

Since the beginning of 2009, Debtor has not maintained any bank accounts. He either cashed his payroll checks or deposited them into his wife's personal bank account.[5] Prior to 2008, Debtor did not make deposits to Mrs. Hentz's bank account. Rather, he kept his own personal and/or business account(s).

### C.    Terrus Hentz's Business and Employment

On January 20, 2009, approximately three months after the Ritchie Bros. auction sale, Debtor's wife, Terrus Hentz, established Valley Tree Services, Inc.[6] But for the "s" at the end of "Service*s*," this name is identical to the name of the corporation formed by Debtor in 2002. Mrs. Hentz selected this name on the advice of her attorney, hoping to take advantage of name recognition. Mrs. Hentz's business operated from the same

---

[4] Debtor explained that it was the creditors who held up the Ritchie Bros. auction sale by not promptly granting him permission to sell collateral that secured their debt, which eventually led to his financial demise. According to Debtor, if the sale had been scheduled before a "market crash" that occurred within a day or so of the sale, he would have received sale proceeds in excess of the debts he owed.

[5] When first asked at trial about whether his paychecks were deposited into his wife's personal bank account, Debtor claimed he did not know the answer to this question. He testified: "I was cashing most of them. . . . I don't know, not my account." He later admitted that many of his paychecks had been deposited into his wife's personal account. He also acknowledged this fact on a spreadsheet he prepared for his attorney and the Trustee for the purpose of demonstrating how he spent the money he received in 2011. See Exh. 9 (Bates 293-304). Specifically, he admitted that the spreadsheet indicates that many of his paychecks and unemployment compensation checks were deposited into his wife's personal bank account and explained that he had used his wife's checkbook records to prepare the spreadsheet.

[6] Debtor and Mrs. Hentz were married in March 2007. They dated in high school and have known each other for more than 20 years. On the date of trial, Debtor and Mrs. Hentz had two children, one who turned four years old in March 2013 and one who was almost one year old.

6

address as Debtor's businesses–the mailbox located at 9812 County Road 21, Hankinson, North Dakota.

When Mrs. Hentz began doing business as Valley Tree Services, its primary business was trucking. The business hauled equipment, general freight, products, gravel and rocks.[7] It also earned a small amount of income from recycling and landscaping. Mrs. Hentz worked with Jeff Medenwald (Debtor's uncle), who served as her broker,[8] and Mike Turner, a truck driver who had worked for Debtor from 1997 or 1998 to August 2008.

Mrs. Hentz testified that Valley Tree Services acquired its first truck for $10,000–which she received from Medenwald for helping Medenwald clear a place where his shop was to be built. During her testimony, she also suggested that she may have also used cash she kept in a safe in her house to purchase the truck.[9] In February 2009, one month after she started doing business, she purchased a second truck with sale proceeds from the first month of business. When questioned about the transfer of vehicles to his wife's business, Debtor denied that his wife acquired any trucks that had been owned by Debtor or his companies.

Records produced by the Trustee show that Valley Tree Services was doing business with Mark while Debtor was employed by Mark. Debtor acknowledged that

---

[7] Debtor and Mrs. Hentz deny that Valley Tree Services provided same or similar services to the sand, gravel and aggregate businesses owned by Debtor.

[8] Debtor denied serving as a broker for his wife.

[9] Mrs. Hentz's testimony on this issue was both confusing and inconsistent with her testimony that all the funds for the truck were received from Medenwald.

Mark paid Valley Tree Services $66,458.36 on February 2, 2009 to haul rock to a site in

Fargo.  Debtor testified that, on behalf of Mark, he negotiated with his wife for the

transportation of this rock.  He stated that Mark needed "a woman trucking company,"

so hired his wife's business which, in turn, subcontracted with truckers to do the work.

Valley Tree Services' General Ledger shows that Mrs. Hentz's business also received

payments from Mark in the sum of $19,999.98 on July 31, 2009 and $12,631.88 on

September 16, 2009.  There were other smaller payments from Mark in 2009 as well.

        In 2010, Valley Tree Services began leasing equipment to various businesses,

including Mark, while maintaining its trucking services.  Valley Tree Services' General

Ledger shows several large payments from Mark, including a $30,346.53 payment on

February 5, 2010; a $21,968.04 payment on June 7, 2010; and a $25,944.00 payment

on November 9, 2010.  Mrs. Hentz testified that Valley Tree Services acquired the

equipment it leased from various people, some of whom advertised on the internet.  She

admitted that she had no experience buying construction equipment and that she had

attended only one auction sale.  She conceded that Debtor gave her advice and found

some of the equipment Valley Tree Services purchased by searching the internet,

attending auction sales and the like.  She maintained, however, that she made the

decisions to buy the equipment Debtor found.

        On April 3, 2010, Valley Tree Services acquired assets formally owned by

Debtor's businesses, including tree spades, semi trailers, a basket truck and other

equipment.[10]  See Exh. 14.  According to Debtor and Mrs. Hentz, Valley Tree Services

_____

        [10] Debtor testified that this is the equipment he had intended to keep if the Ritchie
Bros. sale had generated sufficient proceeds to pay his debts.

8

purchased the assets from Lincoln State Bank, which held a lien against the assets but

had never repossessed them.  Reportedly, the equipment remained in storage vans in

Hankinson with Debtor and his wife until Valley Tree Services bought it.[11]  Both claimed

that Lincoln State Bank owned the assets at the time they were purchased by Mrs.

Hentz's business and there were no direct transfers of equipment from Debtor to Mrs.

Hentz or her business.  Mrs. Hentz maintained that she paid what the equipment was

worth on the day she bought it, even though the sale document suggests she paid half

of auction value.  Exh. 14.  Mrs. Hentz testified that she did not believe she purchased

the equipment for half price.  According to both Debtor and Mrs. Hentz, the tree spades

and other equipment purchased from Lincoln State Bank do not generate a lot of

business income for Valley Tree Services.

Throughout 2010 and 2011, Valley Tree Services expanded its salvage and

recycling business.  Mrs. Hentz testified that Valley Tree Services purchases computer

parts and telephones on eBay and from other sources, sorts the gold from the scrap

and sells the gold.  It also recycles aluminum cans and used cars.  Debtor's father lends

Valley Tree Services a shed to store the aluminum cans it collects.  When Mrs. Hentz is

working, Debtor, his dad or his brother greets customers and provides receipts for

materials that Valley Tree Services recycles.  With the help of Debtor and his brother

and father, Mrs. Hentz (on behalf of Valley Tree Services) buys, gathers, sorts, loads

and hauls enough material to ship a semi-load to Minneapolis to sell once a month.  In

the last several months of 2011, Valley Tree Services typically received over $40,000

---

[11] Mrs. Hentz claimed that she and Debtor did not use the equipment between
August 2008 and the date she purchased it from Lincoln State Bank.

per semi-load of recycled material delivered to Integrated Recycling.

In 2011, Valley Tree Services began farming.  It farmed 30 acres in 2011 and
700 acres in 2012.  It leases farmland from Debtor's parents, who own the land.  Valley
Tree Services paid $105,000 to Debtor's mother, Nancy Hentz, for land rent after its
crop was harvested in 2012.  Mrs. Hentz could not recall what she paid for land rent in
2011.

When asked about her contribution to the Valley Tree Services farming
operation, Mrs. Hentz testified that she combined about 30 acres of corn in the fall of
2012, but did not assist with any farming work in the spring of 2012 because she had a
baby.  Debtor, his brother and the neighbors helped her harvest the rest of her crops.
Debtor's father also assists Mrs. Hentz with farming.

In 2009, Valley Tree Services reported gross receipts of $240,190.  Exh. 3 (2009
tax return).  After expanding the business to provide leased equipment, Valley Tree
Services reported $391,049 in gross receipts.  Exh. 4. (2010 tax return).  Valley Tree
Services realized gross receipts/sales of over $740,000 in 2011.  Exh. 5. (2011 tax
return).  In December 2011, it earned over $60,000 and in the previous two months, it
collected over $70,000 each month.  In January 2012, it earned $80,040.57 in gross
income.   Mrs. Hentz credited the dramatic increase in revenue to the recycling
business.  Recycling and farming is generating the majority of Valley Tree Services'
income in 2013.

In addition to all the work necessary to operate and manage her business, Mrs.
Hentz works full time (an average of 36 hours/week) as a registered nurse.  She has
been employed by Sanford Health in Fargo, North Dakota, for 12 years and commutes

10

an hour each way to and from work four days per week. She maintained that she

performs the majority of the work necessary to run her business, works full time as a

nurse and cares for their infant and toddler, who turned four years old in March 2013.

She testified that she receives some assistance from Debtor and his brother, uncle and

father, none of whom receive compensation from Valley Tree Services except for

Debtor's brother, Josh Hentz, who did not begin receiving compensation until August or

September 2012.[12]

Both Debtor and Mrs. Hentz testified that Mrs. Hentz is (and has always been)

the sole shareholder and operator of Valley Tree Services. Mrs. Hentz also performs all

the bookkeeping for her business. Although Debtor assists his wife with tasks related to

her business such as getting the mail and sorting it,[13] moving trees on occasion,

answering the telephone, negotiating for the purchase and sale of equipment,[14] ordering

and picking up parts for Valley Tree Services' equipment,[15] and driving truck and tractor

on occasion, Debtor maintained he does not hold and has never held an interest in his

wife's business or assets. He testified that he has not co-signed loans with her and he

---

[12] Beginning in August or September 2012, Mrs. Hentz employed Josh Hentz, Debtor's brother, in her business. Josh Hentz had previously assisted Mrs. Hentz with tasks related to her business, but he was not listed as a paid employee in her records until the fall of 2012.

[13] Mrs. Hentz testified that Debtor performs the majority of the work necessary to sort the scrap from the material that may be recycled. Debtor and Mrs. Hentz claimed that it only takes an hour or two a day to complete the sorting.

[14] For example, Debtor assisted Mrs. Hentz with negotiating the sale of trailers that Medenwald (Debtor's uncle) wanted to sell. See Exh. 7 (Bates 159).

[15] See, e.g., Exh. 2 (Bates 76).

11

does not have authority to write checks on her business or personal bank accounts.

However, he has access to the PayPal account used by Valley Tree Services for its

scrap and recycling business and he occasionally deposits money into his wife's

business and personal accounts.  He also acknowledged that he drives the Ford F150

owned by Valley Tree Services.  See Exh. 4 (2010 Tax Return, Bates 96); Testimony of

Debtor.[16]  Debtor maintained that, just as his wife assisted him with bookkeeping and

answering telephone calls for Valley Tree Service and VTS Rock, Debtor assists her

with work related to her business.  According to both Debtor and Mrs. Hentz, Mrs. Hentz

did not receive compensation for the work she performed for Debtor's companies and

Debtor did not and does not receive compensation for the tasks he performs for Valley

Tree Services.

Bank records confirm that Debtor regularly participated in transactions related to

the maintenance, purchase and sale of Valley Tree Services' equipment.  Mrs. Hentz

frequently signed blank checks and gave them to Debtor to enter the sum and "Pay To

The Order Of" lines.  Debtor used these checks to purchase equipment and/or parts at

auction sales (see e.g., Bates 531, ck 1563; Bates 533, ck 1567; Bates 547, ck 1635;

Bates 554, ck 1652 and ck 1645); parts for the maintenance of Valley Tree Services'

equipment (see e.g., Bates 532, ck 1564; Bates 553, ck 1636); and other business

expenses, such as the purchase of chemical (Bates 532, ck 1522), scrap (Bates 554, ck

1645; Bates 574, ck 1729), attorney fees (Bates 574, ck 1728) and miscellaneous

---

[16] Debtor stated that he is not the only person who drives the Ford F150 pickup;
his father and brother drive it as well.  The 2008 or 2009 Chevy he drove before the
Ford F150 truck was repossessed in 2008.  Since then, Debtor has driven vehicles
owned by Mark or the Ford F150 pickup.

expenses (Bates 554, ck 1637, 1648 and 1642).

    **D.   Bonus payment to Debtor from Mark**

    In late February or early March 2011, Debtor received a bonus check from Mark

for $37,081.89, which equated to bonuses for three years of work for Mark.  On March

7, 2011, Debtor deposited the $37,081.89 check into his wife's personal bank account.

Exh. 1 (Bates 11).  Seven days later, on March 14, 2011, Mrs. Hentz withdrew $20,000

at Debtor's request and gave the cash to Debtor.  See Exh. 1 (Bates 12); Exh. 8 (Bates

182).  By March 17, 2011 (the end of the statement reporting period in which the bonus

check was deposited), only $1,800.98 remained in Mrs. Hentz's personal bank account.

Exh. 1 (Bates 11).

    Debtor acknowledged that he was the recipient of other cash withdrawals from

Mrs. Hentz's account during the same time period.  On April 11 and 12, 2011, two

checks in the sum of $5,000 each payable to Edward Jones were issued from Mrs.

Hentz's personal account.  Mrs. Hentz signed the checks but the other information on

them was written by Debtor, who turned the money over to Edward Jones to invest in

Roth IRA account(s).[17]  See Exh. 1 (Bates 17); Exh. 9 (Bates 190, 191).  In addition,

Debtor conceded that a $2,000 cash withdrawal on December 22, 2010, and a $600

cash withdrawal on April 11, 2011, from his wife's personal bank account were given to

---

    [17] At trial, Debtor testified he was not sure what the checks to Edward Jones were
used for and he did not know whose handwriting was on the checks to Edward Jones.
When asked whether the handwriting on the checks was his, he testified:  "I am not sure
if it is or not."  On cross examination from his attorney, Debtor remembered that he had
established Roth IRA accounts in his name, which he planned to use for his children's
education.

him.[18]  See Exh. 9.

When asked about the disposition of the $20,000, $2,000 and $600 cash withdrawals, Debtor testified that he spent it, but offered little detail about the specific transactions.  Debtor explained that he stored the cash in a coffee creamer can that he randomly hid in various hiding spots in his backyard and garage.  He stated that between the time when the cash was withdrawn from his wife's account and February 2012, he spent the cash on personal expenses, such as purchases for his children, clothes, diapers, formula, pop and the like.  He denied spending any of this cash on Valley Tree Services' expenses, a vehicle for himself or any identifiable asset like a investment, motorcycle or snowmobile, and insisted there were no "toys" hidden away. Debtor testified that he spent all of the $22,600 in cash by February 17, 2012, the date he petitioned for bankruptcy relief.  Specifically, he stated that he did not think there was any money left after he paid his attorney fees for preparing and filing his bankruptcy petition.  Other than $3,000 allegedly spent on property taxes[19] and a payment of

---

[18] Debtor denied receiving any money from checks Mrs. Hentz wrote for cash on June 27, 2011 in the amount of $3,500 (Bates 213) or $4,000 on June 1, 2011 (Bates 207).

[19] Debtor testified that he spent $3,000 of the $22,600 in cash on property taxes assessed against the lot in Hankinson.  He also stated that he used the cash to pay $7,100 in back taxes.  When asked if he was sure about whether he used part of the $22,600 in case to make the $7,100 tax payment, he said, "yeah."  Schedule E shows a debt of $7,100 for back taxes, indicating that the taxes had not been paid on the date of petition.  Schedule B also shows that Debtor possessed only $150 in cash on the date of petition, and Debtor had previously indicated that he did not possess any of the $20,000 in cash by the date of petition.  When the Trustee questioned Debtor about this inconsistency in his testimony, Debtor stated: "Well, then I borrowed it from my sister. My sister wrote one of the checks.  I borrowed $3,000 from my sister.  She wrote a check out for it."

14

$1,995 to his bankruptcy attorney, Debtor provided no documentation, receipts or accounting of the items or services purchased with the $22,600 in cash, and he testified there were none.

When questioned about the $20,000 withdrawal from her personal account, Mrs. Hentz testified that she did not know how Debtor spent the money after she gave it to him. Bank records show many withdrawals from Mrs. Hentz's account for family living expenses such as groceries and ordinary household supplies. She testified that she typically does not pay cash for these items. On direct examination of Debtor, the Trustee suggested that all of Debtor's and Mrs. Hentz's expenses are paid from Mrs. Hentz's account rather than the cash Debtor hid and spent. In response, Debtor suggested he might have given his wife cash for some of these expenses, but then testified that he could not remember if he actually gave her cash.[20]

---

When questioned again about how he spent the cash he had stored in the coffee creamer can, he stated: "I don't remember and I don't care. . . . I spent it on everything and anything."

[20] Debtor testified:
Debtor:  Maybe I gave her cash.  What difference does it make?
Trustee: Well, she is writing checks for this.
Debtor: So?
Trustee: So, I'm just looking for an explanation.
Debtor:  Okay, so I gave her my half in cash, so what?
Trustee:  Did you?
Debtor:  I might of, I don't know, I don't remember.  All I know is I don't have any money.  I have no money.  There is nothing else to get.

15

## II.  CONCLUSIONS OF LAW

### A.  Jurisdiction

During the Pretrial Planning and Scheduling Conference, the parties agreed that this Court has jurisdiction over this adversary proceeding.  They also agreed that this is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  Neither party disputes that this Court has authority to enter a final order in this case.  The Court finds that it has jurisdiction under 28 U.S.C. §§ 1334 and 157 and that it has authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.  Denial of Discharge

In his complaint, the Trustee alleged Debtor should be denied a discharge under 11 U.S.C. § 727(a)(2) because Debtor concealed assets within one year preceding his petition for relief and he concealed property of the bankruptcy estate after filing his petition with intent to hinder delay or defraud creditors or the bankruptcy estate.  He also claimed Debtor should be denied a discharge under 11 U.S.C. § 727(a)(3) because Debtor allegedly failed to keep or preserve information from which his financial condition could be ascertained.  In addition, the Trustee alleged that Debtor made a false oath in his bankruptcy filings and should be denied a discharge under 11 U.S.C. § 727(a)(4).

Section 727(a) of the Bankruptcy Code provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

* * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy

16

Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

    (A) property of the debtor, within one year before the date of the filing of the petition; or

    (B) property of the estate, after the date of the filing of the petition;

    (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

    (4) the debtor knowingly and fraudulently, in or in connection with the case—

    (A) made a false oath or account[.]

* * *

    (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy.  Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).  Accordingly, section 727 is strictly construed in favor of the debtor.  Id.  Notwithstanding, a discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C. § 521 (listing a

17

debtor's duties in bankruptcy).

### 1.    11 U.S.C. § 727(a)(2)

In his adversary complaint and at trial, the Trustee alleged that Debtor concealed some of his assets within one year before he petitioned for bankruptcy relief and that he concealed property of the bankruptcy estate after filing his petition with intent to hinder, delay or defraud a creditor or the bankruptcy estate.  As a result, the Trustee requests that Debtor be denied a discharge under 11 U.S.C. § 727(a)(2)(A) and (B).

The elements of proof under sections 727(a)(2)(A) and (B) are virtually the same, differing only in the requisite timing of the debtor's acts and the nature of the property involved.  To prevail under either subsection 727(a)(2)(A) or (B), the Trustee must prove by a preponderance of the evidence: (1) the act serving as the basis for the claim took place within one year before the petition date (subsection A) or after the petition for relief (subsection B); (2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property of the bankruptcy estate; and (4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee.  See Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716, n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008); Fokkena v. Juehring (In re Juehring), 332 B.R. 587, 591 (Bankr. N.D. Iowa 2005).  "'Once a gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors.'"  Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008) (quoting The Abbott Bank-Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir. 1991)).

18

The Trustee argues that the acts which serve as the basis for his cause of action under section 727(a)(2) are Debtor's efforts to conceal his interest in a business titled in his wife's name.  Specifically, the Trustee claims that Valley Tree Services, a corporation in which Mrs. Hentz claims to be the sole shareholder and operator, is actually a mutual asset owned by both Mrs. Hentz and Debtor or, at the very least, Debtor holds an interest in the corporation due to his significant contributions to the business.  The Trustee asserts that Debtor intentionally concealed his interest in Valley Tree Services from creditors who were aggressively seeking to collect debt he owed them prepetition, and intentionally concealed his interest from the Trustee postpetition.

Evidence received at trial supports the proposition that Debtor made and concealed significant contributions to Valley Tree Services.  Mrs. Hentz established Valley Tree Services only three months after the auction sale Debtor maintained prompted his financial problems.  Except for the "s" at the end of "Services," the name of the new business is identical to Valley Tree Service, once owned and operated by Debtor.  The mailing address of Valley Tree Services and location of most or all of its business assets and equipment is the same as Valley Tree Service–either on Debtor's homestead or his parents' property next door.  If customers visit Valley Tree Services, they are greeted by the same people who worked for or offered voluntary assistance to Debtor, including Medenwald, Mike Turner, Debtor's father and brother, Debtor and Mrs. Hentz.  Therefore, Valley Tree Services may appear to former customers of Valley Tree Service to be the same business, although the services offered by the corporations are slightly different.

19

The evidence also shows that one of the first significant business deals for Valley Tree Services was a contract to transport rock for Mark.  Debtor testified that Mark needed a "woman trucking company," so Debtor hired his wife's business to haul rock. Given Debtor's experience with rock mining and hauling and the lack of evidence that Mrs. Hentz possessed the same qualifications, it appears that Debtor was primarily responsible for the business transaction resulting in a payment of $66,458.36 from Mark to Valley Tree Services on February 2, 2009, just days after the business was created. In fact, it would be reasonable to infer that when Debtor learned about business opportunities available to a women-owned business who contracted with Mark, he encouraged his wife to begin doing business as Valley Tree Services.  Valley Tree Services' General Ledger shows other large payments from Mark in 2009 and 2010, presumably arranged by Debtor who served as the Senior Superintendent for Mark and the person primarily responsible for running Mark's business in North Dakota.

In 2010, Valley Tree Services began leasing equipment to various businesses, including Mark.  The evidence shows that Debtor contributed to this business expansion.  Mrs. Hentz testified that Valley Tree Services acquired the equipment it leased from various people, some of whom advertised on the internet.  She admitted that she had no experience buying construction equipment, and that Debtor gave her advice on what to buy.  The Court also received evidence showing that Debtor searched for equipment on the internet, negotiated on behalf of Valley Tree Services for the purchase and sale of equipment and attended auction sales where he bought equipment and paid for it by completing blank checks drawn on Valley Tree Services' account that Mrs. Hentz signed and gave to him in advance of the sales.  Debtor also

20

participated in transactions related to the maintenance and repair of Valley Tree Services' equipment, including selecting parts and paying for them with blank checks Mrs. Hentz signed for such purposes.

Debtor's contribution to Valley Tree Services is most apparent after February 2011, a year before he petitioned for bankruptcy relief and the month he stopped working for Mark and sought no employment outside the home. Valley Tree Services' gross receipts nearly doubled from $391,049 at the end of 2010 to over $740,000 at the end of 2011. During this time, Valley Tree Services expanded its recycling business. Debtor testified that he picked up Valley Tree Services' mail, sorted the mail (including separating the materials the business recycled from the parts discarded), answered the telephone for Valley Tree Services and greeted people who delivered cans and other recyclable materials when Mrs. Hentz was not at home. Business records received as evidence together with trial testimony show that Debtor purchased scrap, deposited checks and accessed Valley Tree Services' PayPal account, which was used for the recycling business. Mrs. Hentz also testified that Debtor, together with some of his relatives, helped her buy, gather, sort, load and haul enough recycled material to send a semi-load to Minneapolis once a month. In the last several months of 2011, Valley Tree Services typically received over $40,000 per semi-load of recycled materials delivered to Integrated Recycling.

In the spring of 2011 (after Debtor became unemployed), Valley Tree Services began farming. It farmed 30 acres in 2011 and 700 acres in 2012. Debtor admitted that he helped with farming tasks, including combining crops. Business records confirm that Debtor bought chemical and farm equipment for Valley Tree Services and paid for these

items with checks Mrs. Hentz signed in advance.

At trial, Debtor and Mrs. Hentz minimized Debtor's role in Valley Tree Services'
business by claiming that Mrs. Hentz performed the majority of the work necessary to
operate the business. Since Valley Tree Services began doing business, Mrs. Hentz
has been working full time as a nurse in Fargo and commuting two hours per day.
During 2011, when Valley Tree Services' business was expanding, the Hentz family
also cared for a two-year-old child. In the spring of 2012, when Valley Tree Services
planted 700 acres of land, Mrs. Hentz was either pregnant or had just delivered a
second child. While the evidence received at trial leaves no doubt that Mrs. Hentz is a
hard worker and performed many of the tasks necessary to run her business, including
bookkeeping and some manual labor, the Court is likewise convinced that Debtor
played a significant role in the success of the business. The Court is not persuaded that
Debtor simply watched TV and fished with his father, while his wife assumed full
responsibility for operating Valley Tree Services and working full time. Given that Valley
Tree Services began by offering trucking services and equipment leases–areas of
business in which Debtor had years of experiences and had achieved great
successes–and that Valley Tree Services expanded its sales and services at a time
when Debtor was unemployed and admittedly assisted his wife with her business,
leaves no doubt that Debtor deserves much credit for its success.

The evidence also shows that Debtor realized benefit from Valley Tree Services.
For example, the business purchased the Ford F150 truck Debtor drives. He has driven
this truck or one owned by Mark since his Chevy was repossessed in 2008.

Some of the equipment Valley Tree Services acquired in 2010 included assets

22

formerly owned by Debtor's business.  Both Debtor and Mrs. Hentz maintained that

these assets (which were purchased from Lincoln State Bank for 50% of auction value)

generated very little business income for Valley Tree Services.  Debtor testified that the

equipment Valley Tree Services purchased from Lincoln State Bank was the equipment

he intended to keep if the Ritchie Bros. sale had been as profitable as anticipated;

however, it was repossessed when his businesses could not afford to pay their debts.

Thus, it appears that Valley Tree Services purchased this equipment primarily to benefit

Debtor who wanted it for reasons unrelated to Valley Tree Services' business.

Further, Debtor relied on the income earned by his wife and her business for his

support and maintenance.  Given Debtor's testimony that he has been unemployed

since February 2011 and all of his cash (including the bonus money he stored in the

coffee creamer can) was gone on the date he petitioned for bankruptcy relief, Mrs.

Hentz's income was the sole source of his support postpetition.  There is also evidence

that funds from Mrs. Hentz's checking account were used for the support of Debtor and

their children prepetition, especially after Debtor lost his job in February 2011.  Part of

the money used for family support prepetition was received from Valley Tree Services.

According to Valley Tree Services' business records, Mrs. Hentz withdrew small sums

of money from Valley Tree Services' account in 2009, and received a salary starting in

2010.  Valley Tree Services' General Ledger, bank statements and checks together with

Mrs. Hentz's checking account records confirm that funds were often transferred from

Valley Tree Services to Mrs. Hentz's personal checking account, which she used for

support of Debtor and their children.

23

Despite these significant contributions and benefits, Debtor denies that he owns an interest in the business or is entitled to compensation from it. Debtor maintains that Mrs. Hentz is the sole shareholder and operator and that none of the assets of Valley Tree Services are in his name.

The fact that Debtor's name is not on Valley Tree Services' corporate documents or titles does not mean that Debtor–or more importantly, his bankruptcy estate–does not have a claim to it. To the contrary, distinctions between a debtor's legal title and those of a separate individual or entity have been found to be unavailing when the debtor is shown to have had an equitable interest in property held by a third party. See Rotella & Assoc., P.A., v. Bellassai (In re Bellassai), 451 B.R. 594, 600 (Bankr. S.D. Fla. 2011); Baron v. Klutchko (In re Klutchko), 338 B.R. 554, 571 (Bankr. S.D.N.Y. 2005). In fact, several courts have found that debtors who transferred all of their salary or their right to receive salary to a family member or to a corporation owned by a family member, yet received benefits from the corporation, held an equitable interest in the relative's business. In re Bellassai, 451 B.R. at 602-03; Coady v. D.A.N. Joint Venture III, L.P. (In re Coady), 588 F.3d 1312,1315-1316 (11th Cir. 2009). These courts, like others faced with similar scenarios, have found that the debtors' efforts to "keep the fruits of [their] industry shrouded," equated to intentional concealment of assets warranting denial of discharge under section 727(a)(2). The Cadle Co. v. Ogalin (In re Ogalin), 303 B.R. 552, 562 (Bankr. D. Conn. 2004); see also In re Coady, 588 F.3d at 1315-16; Cmty. Credit Union v. Hammontree (In re Hammontree), 2011 WL 2357220, at *4-*6 (Bankr. N.D. Ala. Mar. 11, 2011).

24

In light of Debtor's significant contributions to Valley Tree Services and the

benefits he received (and continues to receive) from it, the Court finds that Debtor has

an equitable interest in Valley Tree Services.  The Court also finds that the Trustee met

his burden of showing that Debtor's efforts to hide his contributions to–and equitable

interest in–Valley Tree Services (whether the equitable interest is classified as unpaid

salary or unrecognized capital contributions in the form of labor, loyalty and the goodwill

he earned from previous businesses) from both his creditors prepetition and the Trustee

postpetition are acts that amounted to concealment of property of the bankruptcy

estate.[21]  Accordingly, the Trustee satisfied the first three elements of his section

---

[21] Arguably Debtor's efforts to conceal the "fruits of his industry" by diverting his
labor, loyalty and goodwill to Valley Tree Services also equates to a fraudulent transfer
within the meaning of section 727(a)(2).  Debtor's conduct is analogous to the acts of
debtor Charles Kantorik, a CPA who transferred the benefits of his labor to his family's
accounting practice.  See Good v. Kantorik (In re Kantorik), 475 B.R. 233 (Bankr. W.D.
Pa. 2012).  The court in In re Kantorik opined:

> In sum, the Debtor's wife and son pay all of the Debtor's expenses
> and provide him the ability to continue to use the family accounting practice
> to generate cash income, thereby frustrating the Plaintiff's attempts to the
> [sic] collect the Judgment over a period of several years. Such a pattern and
> practice of running a "cash only" business and diverting the benefits of one's
> labor to an affiliated entity have been considered fraudulent transfers for
> purposes of § 727(a)(2)(A). See Coady v. D.A.N. Joint Venture III, L.P. (In re
> Coady), 588 F.3d 1312, 1315–16 (11th Cir. 2009) (holding that Debtor's
> diversion of the "fruits of his labor" to a business owned by his wife, and
> concealment of any regular compensation through use of business bank
> accounts combined with the financial support he received from his wife was
> "concealment" for purposes of 11 U.S.C. § 727(a)(2)); see also In re Balch,
> 25 B.R. 22, 24–25 (Bankr. N.D. Tex. 1982) (holding that a debtor's discharge
> should be denied when he admitted to depositing monies generated by his
> operation of a sole proprietorship into a corporate bank account bearing his
> wife's name, when that account was created for the specific purpose of
> preventing his creditors from reaching his non-exempt assets).

In re Kantorik, 475 B.R. at 239.  Other courts have denied debtors a discharge under

727(a)(2) cause of action.

Before this Court reaches the ultimate question of whether Debtor is eligible for a discharge, it must first consider the fourth element of the Trustee's section 727(a)(2) cause of action:  whether Debtor concealed his equitable interest in Valley Tree Services with actual intent to hinder, delay or defraud creditors.  See 11 U.S.C. § 727(a)(2).

Absent admissions from the debtor, courts rely on factors or "badges of fraud" to infer actual intent to hinder, delay or defraud creditors.  The badges of fraud include: "(1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor

---

section 727(a)(2) because the debtors transferred goodwill, labor and other assets to affiliated entities.  See Watman v. Groman (In re Watman), 458 F.3d 26, 34 (1st Cir. 2006) (upholding the bankruptcy court's denial of discharge to an individual chapter 7 debtor who fraudulently caused the transfer of patient files, goodwill and other assets from one corporation to another while acting as a principal of both corporations); Lafarge North Am., Inc. v. Poffenberger (In re Poffenberger), 471 B.R. 807, 818 (Bankr. D. Md. 2012) ("These intangible assets, including the transfer of Moser's customers and Moser's goodwill, have value and the fact that Bolivar paid nothing for them is evidence that Bolivar was created to carry on Moser's business free from the pressures of Lafarge and other creditors."); Mullen v. Jones (In re Jones), 445 B.R. 677, 726 (Bankr. N.D. Tex. 2011) (denying a Chapter 7 debtor a discharge under section 727(a)(2)(A) because debtor concealed transfers of goodwill, intellectual property, business opportunities and other assets to new business owned by his domestic partner).

makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry." In re Huynh, 392 B.R. at 810.

The Court finds that the Trustee offered evidence sufficient to show a number of the badges of fraud, compelling the Court to find that Debtor concealed his interest in Valley Tree Services with intent to hinder, delay or defraud his creditors. As detailed above, Debtor donated considerable time and effort to Valley Tree Services, especially after his employment with Mark ended. He claims he did so for no compensation or consideration. The fruits of Debtor's experience and business acumen benefitted a corporation in which his wife was and is the sole shareholder. Although Debtor did not receive a paycheck from Valley Tree Services, he regularly used the F150 truck owned by it. He also received maintenance and support from his wife, who transferred funds from the corporation to the personal checking account she used for family expenses. In addition, Valley Tree Services purchased equipment formerly owned by Debtor's businesses because Debtor wanted to keep it.

From the date Valley Tree Services was incorporated in January 2009 to the date of his petition in February 2012, Debtor was insolvent. At trial, the Trustee offered Schedule F as an exhibit and, through the testimony of Debtor, showed that all of the unsecured debts listed on Schedule F were incurred before September 30, 2008, the date of the Ritchie Bros. sale. In his trial brief and at trial, Debtor conceded that when the Ritchie Bros. sale did not produce the sale proceeds anticipated, Debtor did not have sufficient money to pay his debts. Testimony of Troy Hentz; Debtor's Trial Br. at 4 (noting that Debtor was "insolvent" after the Ritchie Bros. sale).

27

Further, the Trustee showed that a few months prior to and during the time Debtor was employed by Mark (August 2008 to February 2011), creditors pursued efforts to collect debts owed by Debtor and his businesses.  In 2008, multiple creditors filed lawsuits against Debtor and/or his businesses seeking to recover money.  Some of these lawsuits resulted from business disputes, some were foreclosure actions.  See note 3, supra.  One or more of the creditors pursued and received a garnishment against the salary Mark paid Debtor.  Debtor testified that wage garnishments had been in place for a least a year before his employment with Mark ended on March 1, 2011.  When asked whether Debtor knew he had creditors "breathing down his neck" in September 2008, Debtor answered "yes."  Debtor's attorney also asked Debtor whether he was going to make it easy for creditors to collect, and Debtor answered "no."

Before he became insolvent, Debtor maintained personal and/or business bank accounts.  Since the beginning of 2009, Debtor has not maintained any bank accounts.  He either cashed his payroll checks or deposited them into his wife's personal bank account, thereby "not making it easy" for his creditors to levy and execute against his bank account.

Most notably, Debtor deposited a $37,081.89 bonus check paid to him by Mark in his wife's personal bank account.  Seven days later, on March 14, 2011, Mrs. Hentz withdrew $20,000 at Debtor's request and gave the cash to Debtor.  Debtor acknowledged that he was the recipient of other cash withdrawals from Mrs. Hentz's account during the same time period.  On April 11 and 12, 2011, two checks in the sum of $5,000 each payable to Edward Jones were issued from Mrs. Hentz's personal account.  Mrs. Hentz signed the checks but the other information on them was written

28

by Debtor, who turned the money over to Edward Jones to invest in Roth IRA
account(s).  In addition, Debtor conceded that a $2,000 cash withdrawal on December
22, 2010, and a $600 cash withdrawal on April 11, 2011, from his wife's personal bank
account were transferred to him.

When asked about the disposition of the $20,000, $2,000 and $600 cash
withdrawals, Debtor testified that he spent it, but offered little detail about the specific
transactions.  Debtor explained that he stored the cash in a coffee creamer can that he
randomly hid in various hiding spots in his backyard and garage.  He stated that
between the time when the cash was withdrawn from his wife's account and February
2012, he spent the cash on personal expenses, such as purchases for his children,
clothes, diapers, formula, pop and the like.  Other than $3,000 allegedly spent on
property taxes and a payment of $1,995 to his bankruptcy attorney, Debtor provided no
documentation, receipts or accounting of the items or services purchased with the
$22,600 in cash and he testified there were none.  In light of this evidence, it is apparent
that Debtor's efforts to hide cash were designed to avoid aggressive creditors who were
seeking to collect from him.   Debtor's suggestion that this conduct does not equate to
concealing assets because the creditors could use standard discovery to learn where
he squirreled away the money is rejected.

The evidence regarding Debtor's efforts to hide his cash in his wife's bank
account or in his backyard, while not directly tied to his efforts to conceal his interest in
Valley Tree Services, shows a pattern or course of conduct designed to avoid debt
collectors.  This course of conduct continues through to Valley Tree Services, where it is
apparent that Debtor routinely acts on its behalf by discussing transactions with

29

business associates and customers, negotiating for the purchase and sale of equipment and performing manual labor; yet he is not seeking authorization to sign checks or requesting a salary or stock for his contributions to the corporation.

In summary, the Court finds that Debtor concealed his significant contributions to and equitable interest in Valley Tree Services with intent to hinder, delay or defraud his creditors.  Accordingly, the Court denies Debtor Troy Alan Hentz a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2).

### 2.    11 U.S.C. § 727(a)(3) and (4)

Given the Court's determination that Debtor's discharge is denied under section 727(a)(2), it is unnecessary to reach the question of whether his discharge should also be denied under sections 727(a)(3) and 727(a)(4).

The Court has considered all other arguments and deems them to be without merit.

### III.    CONCLUSION

For the reasons stated above, **IT IS ORDERED** that judgment shall be entered in favor of plaintiff in this adversary proceeding.  Defendant/Debtor's discharge is **DENIED** under 11 U.S.C. § 727(a)(2).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this March 25, 2013.

Shon Hastings, Judge
United States Bankruptcy Court

30